485 So.2d 99 (1986)
STATE of Louisiana, Appellee,
v.
Alphonse Alvin LOWE, Jr., Appellant.
No. 17537-KA
Court of Appeal of Louisiana, Second Circuit.
February 26, 1986.
Writ Denied May 12, 1986.
*102 Jerry L. Jones, Monroe, for appellant.
William J. Guste, Jr., Atty. Gen., James Allan Norris, Jr., Dist. Atty., Michael J. Fontenot, Asst. Dist. Atty., Monroe, for appellee.
Before JASPER E. JONES, FRED W. JONES, Jr., and NORRIS, JJ.
NORRIS, Judge.
The defendant, Alphonse Alvin Lowe Jr., was charged by bill of information with nine counts of simple burglary, LSA-R.S. 14:62. The state dismissed one count because of the death of the victim. Lowe proceeded to trial before a six-member jury that found him guilty on seven of the remaining eight counts. The trial court sentenced him to five years at hard labor on each count and fined him $300 plus court costs, with thirty days in default of payment. The sentences were to run concurrently. From this conviction and sentence, Lowe has appealed, advancing eleven assignments of error.[1] For the reasons expressed, we affirm.

FACTS
On the night of February 26,1983, several automobile burglaries took place in the Monroe area. Some of the vehicles burglarized, and the items stolen, were:
(1) Black 1982 GMC pickup truck belonging to Samuel White; a purse, sheath knife, two decanters, C.B. radio, police scanner, and a .22 rifle;
(2) 1975 Ford van belonging to Mrs. Jackie Fuller; cassette player, equalizer, speakers, and a pistol;
(3) 1978 Chevrolet Chevette belonging to Mr. and Mrs. Thomas Ledford; two bags of groceries and a purse;
(4) 1979 Ford pickup truck belonging to Billy Matajowsky; a baseball glove and a pistol;
(5) 1980 Chevrolet Chevette belonging to Mrs. Robin McCann Carter; a purse, a pistol and a checkbook;
(6) 1975 Ford pickup truck belonging to Jimmy McQuillin; a .357 Ruger Blackhawk pistol;
(7) 1981 GMC truck belonging to Steve Antley; a purse and a .22 rifle.
All these burglaries occurred between 7:00 and 11:00 p.m. in parking lots along Louisville Avenue and DeSiard Street.
An eyewitness, David Johnston, reported the events surrounding the first count. He and his wife were searching for a parking place in the K-Mart and Cinema III parking lot on Louisville around 9:00. He spotted a dark-complected man, with long hair and wearing a dark shirt, standing by the window of a black pickup truck with his hand raised. When their eyes met, the suspect lowered his hand and retreated to a green Chevrolet Malibu station wagon parked nearby. The Johnstons parked and, thinking the man's conduct was suspicious, copied the Malibu's license number. They reported this to the theater manager and called the police. They then noticed the Malibu driving off toward Louisville Avenue. They also saw a passenger in the car, *103 but could offer no more of a description than that the passenger might be a woman because of the long hair. A few minutes later, Samuel White, the owner of the black pickup truck, emerged from the theater to discover the passenger window had been broken and several of his belongings had been taken.
On the basis of the suspect description, the vehicle description and the license number, the police issued a "BOLO" ("be on the lookout for") alert for the Malibu. The car's registration was checked. It was registered to Andrew Jaggers Seafood in Metairie but it actually belonged to a Mrs. Esther Lowe in Jefferson.
At about 3:45 the following morning, two Ouachita Parish sheriff deputies were leaving Jojo's, an all-night restaurant where they had taken a coffee break. They noticed the suspect vehicle parked right next to a marked sheriff's car. They confirmed the license number against the BOLO, called the police for reinforcements, and staked out the Malibu. The defendant and his companion soon exited Jojo's and got into the Malibu. As they started to drive off, police and sheriff cars surrounded and stopped them.
Lieutenant Posey and deputy Benton approached the Malibu with their guns drawn. Lt. Posey instructed the occupants to leave the station wagon. When they alit unarmed, the officers holstered their weapons. Lt. Posey identified himself, told them the reason for the stop, and gave them their Miranda rights. He asked for permission to search the station wagon. The defendant agreed but told him to be careful because there was a loaded gun under the driver's seat. Lt. Posey reached under the seat. He found no gun but rather a police radio scanner and a small pick hammer covered with tiny glass particles. Officer Johnson, who had assisted in the stop, then asked the defendant to sign a written consent to search form. He complied; he and his companion, Ms. LaComb,[2] were taken to the police station for booking. The officers had the Malibu towed to the impoundment lot where an inventory search was conducted.
The inventory turned up Samuel White's knife and decanters, Mrs. Fuller's pistol and stereo equipment, the Ledfords' groceries, Billy Matajowsky's pistol and baseball glove, Jimmy McQuillin's pistol, Mrs. Carter's pistol, and Steve Antley's rifle. Officers also found two "lock jocks," a "body puller" and two license plates, all of which might be considered the "tools" of an automobile burglar.[3]
Consequently, Lowe was charged with nine counts of simple burglary on March 11, 1983. His motion to suppress inculpatory statements and the evidence produced in the search was denied on May 24, 1984. His motion to sever the numerous counts was likewise denied on September 24, 1984.
At trial, the state introduced the testimony of the eyewitness from the Cinema III parking lot and of all the officers who apprehended the defendant and searched his car. Each burglary victim testified that his vehicle had been entered without his consent and that some of its contents had been stolen. Because most of the items had been returned to their owners, the state offered photographs of the things found in the search.
The defendant and his companion, who were tried together, asserted that the eyewitness did not make a positive identification. They also produced three alibi witnesses who placed Lowe and LaComb in their hometown of Jefferson, Louisiana at around 7:00 p.m. that night, and in Brookhaven, Mississippi at around 10:15. These witnesses all said that Lowe was driving a *104 brown pickup truck that night. The defense further asserted that Lowe is by trade a body shop technician so it was not unusual for him to be carrying "lock jocks" and "body pullers" in his station wagon. The defense finally argued that a burglar with a car full of stolen goods would not park right next to a sheriff's car. After a four-day trial, the six-member jury found the defendants guilty on seven of the eight counts.
The defendants subsequently filed motions for a new trial. The trial court granted Ms. LaComb's but denied Lowe's. Thus only Lowe has perfected this appeal.

ASSIGNMENT NO. 1: MISTRIAL
In this assignment, Lowe claims the trial court erred in denying his motion for a mistrial when the assistant D.A. allegedly referred to his failure to take the stand in his own defense. LSA-C.Cr.P. art. 770(3). The basis of the motion was a lengthy analogy the prosecutor presented in his closing argument. He said, in essence, that Lowe's case was like that of a parent catching the child who ate the cherry pie after strict instructions not to. The parent finds the fork and pie plate, and telltale cherry stains on the child's clothes, but the child denies eating it. Rather, the child claims he was with three of his friends at the time so he can't be punished. He denies knowing who took the pie and then says, "I am not going to tell you." R.p. 707. This, according to Lowe, was a direct reference to his failure to take the stand.
LSA-C.Cr.P. art. 770 provides in part:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
* * * * * *
(3) The failure of the defendant to testify in his own defense; * * *
Despite Lowe's assertion to the contrary, the prosecutor's remarks here were not a direct reference.[4] The prosecutor only referred to the hypothetical child's refusal to speak. Applied to Lowe, the statement was indirect.
Although article 770(3) seems to mandate a mistrial for either a direct or an indirect reference, our courts have repeatedly held the indirect reference to a different standard for mistrial. The indirect remark must be intended to draw or focus the jury's attention to the defendant's failure to testify or to present evidence in his behalf. State v. Smith, 433 So.2d 688 (La.1983); State v. Frank, 344 So.2d 1039 (La.1977); State v. Bentley, 219 La. 893, 54 So.2d 137 (1951); State v. Ashley, 463 So.2d 794 (La.App. 2d Cir.1985).
The statements here were obviously intended not to emphasize Lowe's failure to testify but to show the strength of the state's circumstantial evidence against the weakness or incompleteness of Lowe's defense. This is a permissible mode of argument. See State v. Smith, supra at 696; State v. Latin, 412 So.2d 1357 (La.1982); State v. Perkins, 374 So.2d 1234 (La.1979).
There were many witnesses the defense could have called to fortify its case. Mrs. Lowe, the defendant's mother and the owner of the Malibu, did not testify. She could have established why her car was not at her home in Jefferson Parish and why her son had to collect it in Monroe. The defense also did not produce the person in Monroe who allegedly delivered the car to Lowe. This person could have established exactly when Lowe got the car and whether it was "loaded" before Lowe took possession. And even assuming the credibility of the alibi witnesses, the defense produced no one to say what became of the brown pickup truck that Lowe and LaComb drove through Mississippi. This would have helped the alibi. All this information could have been provided by people other than the defendant; thus the prosecutor's remarks in summation did not focus on the failure to testify.
*105 The trial court was correct in denying the motion for mistrial. This assignment does not present reversible error.

ASSIGNMENT NO. 2: BEST EVIDENCE
In this assignment, Lowe claims the trial court erred in overruling his "best evidence" objection to the state's use of photographs instead of the actual objects of the burglaries. LSA-R.S. 15:436. Lowe concedes that bulky items may only be admitted in photographic form.[5] From this premise he incorrectly concludes that small, movable things cannot be admitted by photo.
On the contrary, the "best evidence" rule must be applied sensibly and with reason. State v. Gaskin, 412 So.2d 1007 (La.1982). Photographs may serve in lieu of the actual, physical objects. State v. Bates, 397 So.2d 1331 (La.1981); State v. Swift, 363 So.2d 499 (La.1978).
Moreover, a special statute now provides for the use of photos instead of the stolen property. LSA-R.S. 15:436.1 provides in part:
A. A photograph of property alleged to be the object of a theft, otherwise admissible, may be admitted as evidence without regard to the availability of the property itself. * * *
LSA-Acts 1978, No. 243. This statute applies not only to theft but to burglary where "any theft therein" is an element. LSA-R.S. 14:62.
If a defendant can show prejudice by this practice, then the photographs will be inadmissible. State v. Gaskin, supra; State v. Bennett, 341 So.2d 847 (La.1976). In an attempt to show prejudice, Lowe has advanced a strange argument which we address chiefly because it questions the proof of the value of the stolen objects.
Lowe claims that the state offered no proof of these objects' value, and that by introducing photos instead of the actual property, the state deprived the jury of the opportunity to assess the property's value. Lowe logically contends that if the jury find no value, it can find no theft and, consequently, no burglary. LSA-R.S. 14:62, 67. This argument, however, overlooks the meaning of the phrase "anything of value." LSA-R.S. 14:2(2) provides in part:
(2) "Anything of value" must be given the broadest possible construction, including any conceivable thing of the slightest value, movable or immovable, corporeal or incorporeal * * * It must be construed in the broad popular sense of the phrase, not necessarily as synonymous with the traditional legal term "property." * * *
In the broad, popular sense, purses, guns and groceries are things of value, and the value is apparent even in two-dimensional snapshots. Thus there is plainly evidence of value.
If, however, the jury took the pictures for less than the objects they represented, this prejudiced the state. Photos are not as graphic and real as physical evidence. The jury may have belittled the state's case as a result. Thus we cannot agree with Lowe's claim of prejudice, and this assignment does not present reversible error.

ASSIGNMENTS NOS. 3 & 4: PHOTOGRAPHIC EVIDENCE
In these assignments, Lowe complains of the way the photographs were used at trial. Instead of taking individual snapshots of each item found in the Malibu, Lt. Posey made two "layouts" of the entire inventory. Each picture showed a large number of things. At trial, the defense argued that many of the items were irrelevant and prejudicial. At the defendant's request, each photo was partly covered with paper that was cut to reveal only the particular items that each witness identified.
*106 In his fourth assignment, Lowe claims the prosecutor showed the pictures to the jury before they had been covered. The record barely substantiates this claim.[6] The court denied the motion for mistrial, reasoning that the jury did not "perceive the pictures in a manner that they could really tell what they were ... If you lay it down it's hard for me to tell ... what all of those items are on that [photograph]." R.p.p. 346, 347. He also found that the prosecutor did not intentionally expose the complete pictures to the jury. Since Lowe has not alleged conduct that falls within the mandatory mistrial provisions of LSA-C.Cr.P. art. 770, his claim must be based on LSA-C.Cr.P. art. 775, which provides in part:
Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury be dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial * * *.
It is well settled that the trial court has great discretion in the granting or denial of a mistrial and his decision will be reversed only on a clear showing of abuse. State v. Smith, 433 So.2d 688 (La.1983); State v. Smith, 430 So.2d 31 (La.1983). In State v. Bolton, 408 So.2d 250 (La.1981), a witness in a trial for aggravated crime against nature muttered under his breath that the victim was being "railroaded." His speech was low and indirect. The trial judge did not understand what he said; he reasoned that the jury missed it, too. He therefore denied the defendant's motion for mistrial. This is analogous to the instant case. The trial judge did not get a clear impression of the pictures as they lay on the state's table; he concluded that the jury's vision was likewise too obscure to result in prejudicial influence. He found no prejudice and neither do we.
In his third assignment, Lowe claims that the photos, covered at his request, were nevertheless prejudicial because the concealment focused the jury's attention on the hidden items. This created a natural speculation in the jury's mind that what they could not see, was damning. The state contends that the entire photo layout was admissible as part of the res gestae of the crime. LSA-R.S. 15:447, 448. The state also urges that since the defense initiated and approved of the cutting and pasting, it cannot subsequently complain that the effect was prejudicial. See State v. Johnson, 480 So.2d 878 (La.App. 2d Cir. 1985).
The supreme court has addressed the question of photographs that contain items unrelated to the crime. In State v. Giles, 253 La. 533, 218 So.2d 585 (1969), the court held:
[P]hotographs of the stolen objects are not inadmissible simply because other objects are also depicted therein. Because of its character this evidence cannot be sorted, and it is incumbent upon the State to prove which, if any, of the objects thus depicted were stolen. Whether the proof is accomplished is a matter for the trier of facts to decide. 218 So.2d at 588.
Under this rule it was not entirely necessary to cover the other items unless they were prejudicial. The trial court has vast discretion in the admission of photographs. State v. Kirkpatrick, 443 So.2d 546 (La.1983), cert. denied 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 847 (1984); State v. Landry, 388 So.2d 699 (La.1980), cert. denied 450 U.S. 968, 101 S.Ct. 1487, 67 L.Ed.2d 618 (1981); State v. Hardeman, 467 So.2d 1163 (La.App.2d Cir.1985). The trial judge was wise to order the partial covering of the pictures since not all the objects depicted were relevant to the burglaries. He also gave specific instructions on what the jury could consider, and what they should disregard, as evidence. R.p.p. 122, 154. Under these circumstances, we can see no prejudice necessary for reversal.
*107 These assignments do not present reversible error.

ASSIGNMENT NO. 10: IMPROPER ARGUMENT
In this assignment, Lowe claims the trial court erred by denying his motion for mistrial made during the prosecutor's summation. At the outset we observe that defense counsel did not move for a mistrial. He only lodged an objection. In order to invoke the remedy of mistrial, a specific motion is essential. LSA-C.Cr.P. art. 770, Official Revision comment (b); State v. Baylis, 388 So.2d 713 (La.1980); State v. Givens, 445 So.2d 9 (La.App. 4th Cir.1985); cf. State v. Lee, 340 So.2d 180 (La.1976), State v. Williams, 383 So.2d 996 (La.1979). Failure to raise the proper motion amounts to a waiver of any error under article 770.
In his closing statement, the prosecutor remarked that the defense does not have to make an opening statement but that Lowe's counsel had elected to do so; and this opening statement nevertheless failed to mention the three alibi witnesses who would appear in Lowe's behalf. The defense objected, claiming that counsel was misleading the jury by implying that his opening statement had to "tell everybody what I am going to do." The trial court overruled the objection and the prosecutor proceeded with his summation. R.p.p. 678, 679.
The defense correctly asserts that he is not required to deliver an opening statement. State v. Alexander, 339 So.2d 818 (La.1976). Consequently there are no statutory requirements governing what the gratuitous opening statement must contain.[7] When he chooses to make one, however, he is limited to an explanation of the nature of the defense and a discussion of the facts that might be proved by admissible evidence. State v. Wingo, 457 So.2d 1159 (La.1984), cert. denied ___ U.S. ___, 105 S.Ct. 2049, 85 L.Ed.2d 322 (1985). The state interprets this jurisprudential rule to require an explanation of the nature of the defense. We pretermit deciding whether the defense should have outlined its alibi theory in the opening statement because the problem lies not there but in the closing statement. The contested remark arose in the state's summation, which is confined to the evidence admitted, to the lack of evidence, to conclusions of fact and to applicable law. LSA-C.Cr.P. art. 774. The defendant's opening statement is not evidence. State v. Wingo, supra. Under these circumstances, the prosecutor's remark exceeded the proper scope of closing argument.
This conclusion does not mandate reversal. As we noted at the outset, there was never a motion for mistrial or admonishment. The error is therefore considered waived. State v. Baylis, supra; State v. Mallett, 357 So.2d 1105 (La.1978), cert. denied 439 U.S. 1074, 99 S.Ct. 848, 59 L.Ed.2d 41 (1979).
Out of abundant caution, however, we have also considered whether the defendant's unadorned and unpursued objection should be construed as a motion for mistrial. Cf. State v. Lee, supra. If so, the proper standard would be whether the remark influenced the jury and contributed to its verdict. State v. Jarman, 445 So.2d 1184 (La.1984). Even if this standard is applied, Lowe has not shown sufficient prejudice to mandate mistrial. The statement did not belittle Lowe's counsel, nor did it unfairly attack the alibi witnesses' credibility. The overall effect was not such as to "make it impossible for the defendant to obtain a fair trial." LSA-C.Cr.P. art. 775. In sum, this assignment does not present reversible error.

ASSIGNMENT NO. 6: MOTION TO SUPPRESS
Here Lowe claims the trial court erred by failing to suppress an allegedly inculpatory statement he made right after the *108 officers stopped him. This motion's procedural stance is complex. There were three hearings on the motion to suppress. The first was on June 9, 1983, when the state informed the trial judge that it was "not aware" of any inculpatory statement; thus he considered it unnecessary to rule on that aspect of the motion. He proceeded, however, with the motion with respect to the fruits of the warrantless search. Both aspects of the motion were also within the scope of the second hearing on May 24, 1984, which resulted in denial of the motion. At trial in January 1985, defendant was represented by new counsel and court was presided over by a new judge. Before the minutes could be checked to find the prior disposition of the issue, there was a third hearing, in the middle of the trial but outside the jury's presence. In this third hearing, Lowe took the stand and testified that he had been coerced into mentioning the gun and that he had done so without the benefit of his Miranda warnings. LSA-R.S. 15:451; LSA-C.Cr.P. art. 743. After a recess, the trial judge announced that the issue had been resolved in an earlier hearing. He then terminated the mid-trial hearing. Because this third hearing addressed issues that had been already resolved it was completely unnecessary. We therefore decline to consider the additional, cumulative evidence adduced at the third, mid-trial hearing.
On appeal, Lowe is not contesting the ruling as to the fruits of the warrantless search. He narrows his attack to the admission of the statement about the gun. He does not claim that the search arose out of the statement. He seems to claim only that he was prejudiced by letting the jury hear that he was carrying a gun in the station wagon.
We have already outlined the facts surrounding the stop and search. These were fully developed at the second suppression hearing. We cannot conclude that the statement was coerced or elicited through interrogation. Lt. Posey did not ask, "What do you have in the car?" He only asked for permission to search; a "yes," or a "no," or a "do I have a choice?" would have been the appropriate answer. The remark about the loaded gun was unsolicited and unresponsive, and came after Lowe received his rights. The situation was tense, but Lowe was not compelled to speak. State v. Robinson, 384 So.2d 332 (La.1980), and citations therein; State v. Fuller, 446 So.2d 799 (La.App. 2d Cir.1984), writ denied 447 So.2d 1079 (La.1984).
Furthermore, the record does not substantiate Lowe's assertion in brief that he was "questioned" before receiving Miranda warnings. In the first two hearings on the motion, Lt. Posey and Officer Harris clearly remember reading the rights off a card before they asked to search. R.p.p. 171, 172; 218; 240. The trial court correctly concluded that Lowe really did receive his rights before he volunteered the statement about the loaded gun.
Finally, even if the remark was improperly admitted, the error is harmless. The officers had probable cause, based on the vehicle description and the license identification, to stop the station wagon. Its obvious mobility created exigent circumstances that justified the stop and the subsequent search. Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), rehearing denied 400 U.S. 856, 91 S.Ct. 23, 27 L.Ed.2d 94 (1970); State v. Guzman, 362 So.2d 744 (La.1978), cert. denied 443 U.S. 912, 99 S.Ct. 3103, 61 L.Ed.2d 876 (1979). The legitimate warrantless search would have turned up the gun anyway. The remark itself does not implicate the gun in the crime and does not refer to the gun as stolen property.[8] Though not neutral, the remark was not prejudicial enough to affect Lowe's substantial rights. LSA-C.Cr.P. art. 921.
This assignment does not present reversible error.

*109 ASSIGNMENT NO. 9: SEVERANCE
In this assignment Lowe claims the trial court erred in failing to grant his motion for severance. He concedes that all the counts charged were same or similar in character but contends the cumulation of evidence prejudiced him. LSA-C.Cr.P. arts. 493, 495.1. He admits, for purposes of argument only, that the circumstantial evidence was convincing as to count one, which was witnessed by Mr. Johnston, but that the jury transferred the guilt from the sure to the unsure charges, where there were no eyewitnesses. He also cites State v. Carter, 352 So.2d 607 (La.1977) in his support.
We begin by analyzing the article and distinguishing the Carter case. Carter was grounded in an earlier version of art. 495.1 which had provided, in part:
The court, on application of the prosecuting attorney, or on application of the defendant shall grant a severance of offenses whenever:
(a) if before trial, it is deemed appropriate to promote a fair determination of the defendant's guilt or innocence of each offense; * * * (emphasis added)
After the decision in Carter, the legislature amended art. 495.1 to read:
If it appears that a defendant or the state is prejudiced by a joinder of offenses in an indictment or bill of information or by such joinder for trial together, the court may order separate trials, grant a severance of offenses, or provide whatever other relief justice requires. (emphasis added) (as amended by LSA-Acts 1978, No. 466).
This amendment makes severance discretionary; there is no longer the strong statutory encouragement of severance that influenced the Carter court. A concomitant of discretionary severance is that we will not overturn a trial court's ruling absent an abuse of discretion. State v. Washington, 386 So.2d 1368 (La.1980).
We agree that there was a large amount of evidence in this case. The trial lasted four days.[9] The state's presentation, however, was fairly logical. It began with the testimony of the eyewitness, who made an identification and linked the defendant with the crimes. Then each victim testified in the same sequence as the charges were billed. Each identified his property in the photographs. Then came the officers who had responded to the victims' calls, who had apprehended the defendants, and who conducted the search. This was done in good enough sequence to enable the jury to compartmentalize the evidence of each charged crime. State v. Machon, 410 So.2d 1065 (La.1982).
The trial's outcome thoroughly disproves Lowe's argument that the jury could not differentiate between the offenses. The jury returned a verdict of not guilty on one of the eight counts. This result would have been impossible under Lowe's argument.
This assignment does not present reversible error.

ASSIGNMENTS NOS. 8 & 11: SUFFICIENCY OF EVIDENCE
In these assignments, Lowe claims the trial court erred in denying his motion for a new trial. He first argues that the evidence was insufficient to convict him of the offenses. He then points to the fact that his codefendant, Marsha LaComb, was granted a new trial, while the case against her was identical to the case against him.
At the outset, we note the jurisdictional problems involved with appealing a denial of new trial based on insufficient evidence. *110 LSA-C.Cr.P. art. 851; LSA-Const. Art. 5 § 10; State v. Korman, 439 So.2d 1099 (La.App. 1st Cir.1983); Tibbs v. Florida, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). The difficulty is obviated, however, because both the trial court and the defendant in brief have treated this as a motion for post-verdict judgment of acquittal. LSA-C.Cr.P. art. 821. We shall analyze these assignments accordingly. State v. Korman, supra; State v. Ford, 467 So.2d 1243 (La.App. 2d Cir.1985), writ denied 474 So.2d 1302 (La.1985).
In reviewing the sufficiency of the evidence to support a conviction, we must determine that the evidence, "viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all the elements of the crime had been proved beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Captville, 448 So.2d 676 (La.1984). Thus we are bound to resolve any conflict in direct evidence in the light most favorable to the prosecution. The standard for circumstantial evidence is enunciated differently. Assuming every fact to be proved that the evidence tends to prove, in order to convict, circumstantial evidence must exclude every reasonable hypothesis of innocence. LSA-R.S. 15:438. We recently explained,
[T]he circumstantial evidence rule of LSA-R.S. 15:438 may not establish a stricter standard of review than the more general reasonable juror reasonable doubt formula, but it emphasizes the need for careful observance of the usual standard, and provides a helpful methodology for implementation in cases which hinge on the evaluation of circumstantial evidence. In sum, the Jackson standard is a constitutional standard gleaned from the due process clause of the 14th Amendment. R.S. 15:438 is a statutory evidentiary standardnot a constitutional standardand as such, forms the heart of the inquiry in affecting the sufficiency of the evidence under the Jackson standard of appellate review. A single standard for appellate review, comporting with the sufficiency standard established in Jackson v. Virginia, is all that is constitutionally required.
State v. Jones, 451 So.2d 35, 40 (La.App. 2d Cir.1984), writ denied 456 So.2d 171 (La. 1984), citing State v. Chism, 436 So.2d 464 (La.1983).
The substance of Lowe's claim is that the state's case is entirely circumstantial, as it is based on one weak eyewitness identification and the defendant's later apprehension in a positively-identified station wagon loaded with stolen goods. He contends that his alibi evidence, by contrast, created an alternate hypothesis that was compelling enough to persuade a rational factfinder. We are not persuaded.
The state's case, though circumstantial, is nevertheless strong. Mr. Johnston's eyewitness description of Lowe and LaComb may not withstand strict scrutiny but it conformed to the suspects in a general way. The automobile and license identifications were exact. The burglaries occurred in a narrow timespan in a specific area and showed the same mode of operation. Lowe was caught in that area shortly afterwards. The suspect station wagon was filled with the stolen items, mostly concealed under a blanket. After he was stopped, Lowe surrendered peacefully.
Lowe's alternate hypothesis is that he was driving from Jefferson to Monroe when the burglaries occurred and that when he collected his mother's station wagon, it was already full of stolen goods. Thus he claims he innocently picked up a car full of hot items. This story does not cast doubt on the state's case because it is too full of doubt of its own. It is based on the testimony of three witnesses. Of these, Lowe's uncle did not remember exactly when Lowe left Jefferson, and Lowe's brother could not even remember the date. A slight margin of error in their timing would put Lowe reaching Monroe exactly when the burglaries started. From this imprecise testimony Lowe asked the jury to believe he was driving north to make a car swap. There was no direct evidence about *111 the car-swapping scheme; it is strictly hypothetical. The defendant's own evidence supports a theory that Lowe drove north for a quick take. Thus the alibi testimony does not undermine the state's case; it supports it. This evidence as a whole withstands the Jackson v. Virginia test.
Lowe's special bone of contention is that his codefendant got a new trial while he did not. The evidence against her was not the same. The eyewitness only saw a person he thought was a female sitting in the station wagon. R.p. 291. This makes the evidence against her weaker, and apparently convinced the trial judge that a new trial was necessary. In addition, the eyewitness's description was extremely weak. More evidence was needed to hold her as a principal to the crimes. The same cannot be said for Lowe.
These assignments do not present reversible error.

ASSIGNMENT NO. 7: EXCESSIVE SENTENCE
Here Lowe urges the trial court erred in not giving him a suspended sentence. He correctly asserts that he is not excluded from probationary or suspended treatment because he is a first felony offender. LSA-C.Cr.P. art. 893. A suspended sentence, however, is not mandatory, even with a first offender. It is discretionary and may be dispensed with according to the standard sentencing guidelines of LSA-C.Cr.P. art. 894.1. See State v. McKethan, 459 So.2d 72 (La.App. 2d Cir. 1984).
These sentencing guidelines provide criteria for determining whether a sentence is excessive. State v. Sepulvado, 367 So.2d 762 (La.1979); State v. Tully, 430 So.2d 124 (La.App. 2d Cir.1983), writ denied 435 So.2d 438 (La.1983). The trial judge need not articulate every aggravating and mitigating circumstance but the record must reflect that he adequately considered them in particularizing the sentence to the defendant. State v. Smith, 433 So.2d 688 (La.1983); State v. Hammonds, 434 So.2d 452 (La.App. 2d Cir.1983), writ denied 439 So.2d 1074 (La.1983). A legal sentence may be excessive if it is grossly out of proportion to the offense or amounts to a needless imposition of pain and suffering. LSA-Const. Art. 1 § 20; State v. Bonanno, 384 So.2d 355 (La.1980); State v. Cunningham, 431 So.2d 854 (La.App. 2d Cir. 1983), writ denied 438 So.2d 1112 (La.1985). If not, sentencing is the trial court's province and we will not disturb it except on a showing of manifest abuse of discretion. State v. Square, 433 So.2d 104 (La.1983); State v. Hammonds, supra.
Lowe chiefly claims the trial court did not adequately consider the hardship of a prison term on his wife and family. There was no PSI from which we could verify Lowe's family obligations. The record, however, establishes that Lowe got married to his codefendant after the instant offense. His bride, at least, knew of the potential prison time when she entered the banns.
Lowe also urges that a "forty year old hard working man with his own business, a wife, and four children does not begin a life of petty crime by travelling to another town." This statement touches all the points that the trial court mentioned at sentencing. Even though this is Lowe's first felony conviction, he has a considerable record of prior arrests, including two for simple burglary and one for theft. Lowe attempted to explain these charges at the sentencing hearing, but the similarity and frequency of the offenses were too difficult to explain. Lowe's age and maturity strike against him as well. The judge was also impressed by the apparent long-distance scheme to engage in criminal activity. Finally, this was not a lone transgression. Lowe was found guilty on seven charges.[10] These factors were adequately considered by the sentencing judge.
*112 The maximum penalty for simple burglary is a fine of $2,000 or imprisonment with or without hard labor for twelve years, or both. Thus his sentencing exposure was 84 years at hard labor and $14,000 in fines. He received a sentence of five years on each count, all to run concurrently. This is at the lower end of the range, suggesting that the judge did indeed consider the mitigating circumstances. The sentence is not excessive and this assignment does not present reversible error.
For the reasons expressed, the sentence and conviction are affirmed.
AFFIRMED.
NOTES
[1] Lowe's fifth assignment of error was neither briefed nor argued so it is considered abandoned. URCA-Rule 2-12.4; State v. Williams, 338 So.2d 672 (La.1976); State v. Domingue, 298 So.2d 723 (La.1974).
[2] Marsha LaComb was jointly tried with Lowe. They have since married.
[3] A "lock jock" is a slim metal strip that is slid down the window shaft of a car door to unfasten the lock without a key. A "body puller" is a device that fixes car dents. The mechanic drills a small hole in the middle of the dent and then sticks in the body puller. It expands and the mechanic pulls it until the sheet of metal gets back into shape. The license plates found inside the Malibu were both traced to other vehicles registered to Lowe.
[4] For an example of a direct reference, see State v. Hall, 297 So.2d 413 (La.1974).
[5] See, e.g., State v. Dilworth, 358 So.2d 1254 (La.1978), prosecution for theft of a fence that was four feet high and thirty-one feet long; and State v. Alderman, 285 So.2d 193 (La.1973), prosecution for taking a deer out of season.
[6] Before the assistant D.A. began cutting and pasting, defense counsel noticed that one of the pictures was "laying out there in plain view." The trial judge said, "They're laying out ... the way you're waving it around, the jury and I and everybody else can see them." R.p. 344.
[7] Compare LSA-C.Cr.P. art. 766, which gives guidelines for the state's mandatory opening statement.
[8] At the third suppression hearing, out of the jury's presence, Lowe testified that he told Lt. Posey that the gun beneath the seat belonged to someone else. R.p. 577.
[9] The trial's length could have been greatly reduced if the assistant D.A., defense attorneys and the trial judge had struck an agreement about using the photographs as evidence. Every time the photographs were proffered, the defense objected, the jury had to be removed, and the trial bogged down in the same discussions that we considered in Assignments Nos. 2, 3 & 4. This happened at least eight times. We are not attempting to belittle the defense objections, but their frequency and repetitiveness could have been avoided by preparing the cut-and-paste graphics beforehand and resolving the best evidence objections in one ruling.
[10] There was also evidence, unadmitted at trial but seized from the station wagon, linking Lowe to three burglaries in Morehouse Parish and possession of controlled dangerous substances and marijuana.